UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re MICHAEL K. O'MALLEY, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | _____ |
| | ) | |
| BRENDA P. HELMS, TRACY ZELLMER, and TAMO, LLC, | ) | 20 C 443, 20 C 494, 20 C 801 |
| | ) | |
| | ) | Judge Gary Feinerman |
| Appellants, | ) | |
| | ) | |
| vs. | ) | Appeal from: No. 13 B 10864 |
| | ) | No. 16 A 552 |
| METROPOLITAN LIFE INSURANCE COMPANY, | ) | |
| | ) | Bankruptcy Judge Janet Baer |
| Appellee. | ) | |

## MEMORANDUM OPINION AND ORDER

Tracy Zellmer and her company TAMO, LLC appeal from orders of the bankruptcy court: (1) granting summary judgment to Brenda P. Helms, the Chapter 7 Trustee for the bankruptcy estate of Michael K. O'Malley, in an adversary proceeding brought by the Trustee against Zellmer, TAMO, O'Malley, and O'Malley's former employer, Metropolitan Life Insurance Company ("MetLife"), Doc. 2 (20 C 443); (2) denying Zellmer's motion to clarify the summary judgment order, *ibid.*; and (3) denying the Trustee's motion to approve a proposed compromise between the Trustee and Zellmer that would have entailed vacating the summary judgment order, Doc. 1 (20 C 494). The Trustee separately appeals the order denying the motion to approve the compromise. Doc. 1 (20 C 801). The bankruptcy court's rulings are affirmed.

## Background

Except where noted, the background is taken from the bankruptcy court's summary judgment opinion. 601 B.R. 629 (Bankr. N.D. Ill. 2019).

### A. O'Malley's MetLife Retirement Plans

O'Malley, the debtor, worked at MetLife from 1981 to 2005.  On March 19, 2013, he filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 701 *et seq*.  On April 5, he filed his Schedule B—which discloses the debtor's personal property—and Schedule C—which allows the debtor to claim property as exempt from the bankruptcy estate.  *See* 11 U.S.C. § 521(a)(1)(B)(i) (requiring the debtor to file "a schedule of assets and liabilities"); *id*. § 522(b)(1) (allowing the debtor to claim property as exempt); *id*. § 522(*l*) (requiring the debtor to file "a list of property that the debtor claims as exempt under subsection (b)"); Fed. R. Bankr. P. 1007(b) (describing the schedules in greater detail); Fed. R. Bankr. P. 4003(a) (requiring the debtor to file both schedules simultaneously).  Those schedules did not disclose an interest held by O'Malley in any retirement plan.

On April 23, 2013, the first meeting of creditors was held.  *See* 11 U.S.C. § 341(a) (requiring convening of a meeting of creditors).  O'Malley stated at the meeting that he would amend his schedules to include a MetLife defined benefit pension plan.  On June 4, he filed amended Schedules B and C, which listed a single "Met Life Defined Benefit Pension Plan" of "Unknown" value and claimed that 100% of its value was exempt from the estate under an Illinois law that protects pension benefits from wage garnishment.  Doc. 11-14 at 64 (20 C 443) (citing 735 ILCS 5/12-704).  (Unless noted otherwise, all subsequent docket citations are to Case 20 C 443.)  After several adjournments, the meeting of creditors concluded on February 11, 2014.  Neither the Trustee nor any creditor objected to the exemption claimed by O'Malley for the pension plan disclosed in the amended schedules.

Although the amended schedules listed a *single* MetLife pension plan, O'Malley in fact participated in *two* MetLife plans established under separate plan documents.  The first was the

"Metropolitan Life Retirement Plan for United States Employees," which the parties call the "Traditional Plan."  Doc. 50 at 10; Doc. 53 at 8.  The Traditional Plan was designed to comply with the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and certain Internal Revenue Code ("IRC") provisions governing tax-qualified pension plans.  The second was the "MetLife Auxiliary Pension Plan," which was "completely unfunded" and "entirely separate from the [Traditional] Plan."  Essentially the mirror image of the Traditional Plan, the Auxiliary Plan was designed to avoid restrictions imposed by ERISA and provide deferred compensation above the levels eligible for tax-qualified status.  The Auxiliary Plan instead was designed to comply with § 409A of the IRC, 26 U.S.C. § 409A, which imposes certain requirements on nonqualified deferred compensation plans.

O'Malley was to start receiving benefits under the Auxiliary Plan on August 1, 2015, while his bankruptcy case remained pending.  Three months prior, on May 6, 2015, MetLife sent O'Malley a letter explaining his various distribution options.  Doc. 15-6 at 13-15.  The options included a "life annuity," which was payable only to the participant during his lifetime, and a "contingent survivor annuity," which also paid benefits to the participant's beneficiary after the participant's death.  *Id.* at 30-31.  The contingent survivor annuities came with a range of sub-options.  The 10% contingent survivor annuity, for instance, provided relatively large monthly payments to the participant, but monthly payments of only 10% of that amount to the survivor after the participant's death; the 100% contingent survivor annuity, by contrast, provided equal monthly payments to the participant and survivor, though at an amount lower than that paid to the participant under the 10% option.  *Id.* at 31.  The 50% contingent survivor annuity fell between those two extremes.  *Ibid.*  Under the Auxiliary Plan, married participants who failed to

make a timely election were automatically enrolled in the 50% contingent survivor annuity as a default election. Doc. 11-5 at 73, art. 4.3(b)(ii).

In his timely election on July 23, 2015, O'Malley designated Zellmer—whom he had married on June 5, 2015—as his beneficiary and elected the 100% contingent survivor annuity option. In so doing, O'Malley forwent higher payments to himself in favor of larger payments to Zellmer after his death. Relative to the lower percentage contingent survivor options, this choice shifted more of the value of the annuity from O'Malley to Zellmer. Pursuant to his election, O'Malley began receiving monthly payments of $3,614.72. O'Malley directed MetLife to send those payments to a bank account controlled by TAMO, Zellmer's company.

O'Malley had not sought the bankruptcy court's permission to elect the 100% option or direct that his monthly payments be sent to TAMO. On July 13, 2016, MetLife received a "turnover letter" from the Trustee claiming the Auxiliary Plan benefits for the bankruptcy estate. *See* 11 U.S.C. § 542(a) (requiring any entity possessing property belonging to the bankruptcy estate to deliver it to the Trustee). Complying with the Trustee's letter, MetLife stopped directing O'Malley's monthly payments to TAMO in August 2016. By that point, TAMO (and thus Zellmer) had received at least $46,991.36 in payments from the Auxiliary Plan. The Trustee also sent letters to Zellmer and O'Malley demanding return of all Auxiliary Plan funds in their possession, but they refused that demand.

### B. The Adversary Proceeding

On August 31, 2016, the Trustee filed an adversary complaint against MetLife, O'Malley, Zellmer, and TAMO regarding the disputed Auxiliary Plan benefits. *See* Fed. R. Bankr. P. 7001 (providing that certain disputes involving the debtor must be resolved in an "adversary proceeding" separate from the lead bankruptcy case); 2 *Collier on Bankruptcy* ¶ 301.03 (16th ed.

2020) ("The term 'case' … refers to the overall spectrum of legal action taken under one of the debtor relief chapters. … The term 'proceeding,' by contrast, refers to any particular action raised or commenced within the case, including motions and adversary proceedings … .").

After the bankruptcy court denied O'Malley's and Zellmer's motions to dismiss the adversary complaint, Doc. 11-4 at 2-3, the Trustee moved for summary judgment, *id*. at 71-75. The Trustee contended that O'Malley's interest in the Auxiliary Plan was property of the bankruptcy estate and that all its proceeds should be returned to the estate. The Trustee also sought to nullify O'Malley's election of the 100% contingent survivor annuity and to elect an alternate distribution that would maximize the value of the Auxiliary Plan to O'Malley (as opposed to Zellmer) and hence to the estate. O'Malley cross-moved for summary judgment, arguing that he had validly claimed the Auxiliary Plan as exempt; Zellmer asserted the same ground in opposing the Trustee's motion. MetLife took no position as to the ownership of the Auxiliary Plan, but it partially opposed the Trustee's motion on the ground that it was too late under § 409A of the IRC to nullify the 100% contingent survivor annuity election.

On May 10, 2019, while the summary judgment motions were pending, O'Malley died. O'Malley's counsel quickly moved to stay ruling on the summary judgment motions, but the bankruptcy court denied a stay. Doc. 11-11 at 121-124; 601 B.R. at 635 n.1.

On May 23, 2019, less than two weeks after O'Malley died, the bankruptcy court issued a carefully reasoned and detailed 43-page opinion granting in large part the Trustee's summary judgment motion. The court ruled that because O'Malley failed to disclose the Auxiliary Plan on his Schedule C, the Trustee did not waive her challenge to the Plan's exemption from the estate. 601 B.R. at 640. The court then ruled that the Auxiliary Plan in fact was not exempt and thus passed into the estate. *Id*. at 648-49. The court also held that the Trustee was entitled to

rescind—in bankruptcy terminology, to "avoid," 11 U.S.C. § 549(a)—O'Malley's election of the 100% contingent survivor annuity. 601 B.R. at 653-54. However, agreeing in part with MetLife, the court held that the Auxiliary Plan's terms precluded the Trustee from affirmatively making a new election, and therefore that the Plan would revert to the default 50% contingent survivor annuity. *Id*. at 655. Finally, the court granted O'Malley summary judgment as to a theory of relief, set forth in Count V of the adversary complaint, no longer at issue. *Id*. at 658.

Along with its opinion, the bankruptcy court issued a separate document titled "Order Granting Trustee's Motion for Summary Judgment as to Counts I-IV, Granting O'Malley's Motion for Summary Judgment as to Count V, and Dismissing Sua Sponte Count VI." Doc. 11-12 at 48; Doc. 11-13 at 1. The order memorialized the disposition of the claims enumerated in the adversary complaint, but did not fix the precise obligations of or awards to any party. *Ibid*. On January 23, 2020, the day after Zellmer filed her appeals, the bankruptcy court entered an order fixing the dollar amount ($68,561.82) payable by MetLife to the Trustee under the summary judgment ruling. Doc. 15-12 at 15-16.

C.    **Subsequent Motions**

On June 6, 2019, Zellmer moved for what she described as a "clarification" of the bankruptcy's court's summary judgment order. Doc. 11-13 at 2-8. She styled the motion under Bankruptcy Rule 9023, *id*. at 5, ¶ 1, which incorporates Civil Rule 59. The motion asserted that O'Malley's death shortly before the bankruptcy court issued its ruling resulted in "some ambiguity as to what rights Zellmer now has as the surviving spouse." *Id*. at 6, ¶ 7. Zellmer argued that, by her lights, the bankruptcy court's ruling entitled her to the 100% contingent survivor annuity even though the court had avoided that election. *Id*. at 6-7, ¶¶ 9-10. She asked

6

that the bankruptcy court's opinion and order "be modified to make clear" that she could still receive benefit payments at the higher, 100% level. *Id*. at 7, ¶ 10.

While Zellmer's motion to "clarify" was pending, the Trustee moved the bankruptcy court under Bankruptcy Rule 9019 to approve a compromise between the Trustee and Zellmer. Doc. 11-14 at 93-122. The proposed compromise provided that Zellmer would pay the Trustee $75,000, and in exchange Zellmer would regain her right to payments at the 100% contingent survivor annuity level. *Id*. at 103-104, ¶ 17.c.-d. The proposed settlement's terms—which were arguably inconsistent with Zellmer's professed view that the summary judgment ruling *already* entitled her to the 100% contingent survivor annuity payments—rested on the assumption that the Trustee was entitled "to request that the Bankruptcy Court modify the Summary Judgment Order … to preserve [Zellmer's] right to receive benefits under the Auxiliary Plan pursuant to the 100% contingent survivor annuity." *Id*. at 103, ¶ 17.c. The Trustee provided no legal basis for her authority beyond describing it as a "waiver of her right to avoid the Payment Election." *Id*. at 107, ¶ 22. The theory seemed to be that, because the Trustee had power under 11 U.S.C. § 549(a) to seek avoidance of O'Malley's 100% contingent survivor annuity election, she could freely waive the avoidance even after the bankruptcy court had issued its ruling.

It is worth pausing to explain the economics of the proposed compromise. When the Trustee filed the adversary complaint in 2016, O'Malley was alive, and by avoiding his 100% contingent survivor annuity election, the Trustee could hope to obtain many years' worth of higher payments for the estate. But O'Malley's death dramatically reduced the difference between the respective values of the 100% and 50% annuity options from the Trustee's perspective. In the motion for compromise, the Trustee noted that, for her, the gap between those two options had narrowed to about $20,000. Doc. 11-14 at 107, ¶ 23. Zellmer, by

contrast, stood to gain substantially if the 100% option were restored because that would allow her to receive higher payments from MetLife for the rest of her life. In opposing the compromise, MetLife asserted that, assuming an average life expectancy, the present value to Zellmer of the difference between those two options was nearly $700,000. *Id*. at 128 & nn.2-3. So, $75,000 was a bargain price for Zellmer to pay to restore the 100% contingent survivor annuity election, and the Trustee would net about $55,000 in the deal for the bankruptcy estate. The loser would be MetLife, as it would be required to pay Zellmer additional Auxiliary Plan benefits with a present value of nearly $700,000 over the course of her lifetime relative to what it would have paid under the 50% option. *Id*. at 128.

MetLife thus opposed the compromise, arguing that it would unfair "to reverse the Court's summary judgment ruling by contractual agreement" and thereby force MetLife to fund the compromise. *Ibid*. MetLife added that the Trustee could not freely waive its avoidance claim because any right to do so "was extinguished when the [bankruptcy] Court issued its Memorandum Opinion." *Id*. at 131. In replying to MetLife's opposition, the Trustee argued for the first time that Civil Rule 60(b)(6), made applicable by Bankruptcy Rule 9024, authorized her request "to modify the Summary Judgment Order." *Id*. at 167 & n.3; *see* Fed. R. Civ. P. 60(b)(6) ("On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for … any … reason [other than the five reasons set forth in subsections (b)(1)-(5)] that justifies relief."). MetLife responded that the circumstances did not justify relief under Rule 60(b)(6). Doc. 15-14 at 46-49.

At a hearing on January 8, 2020, the bankruptcy court denied Zellmer's motion to clarify the summary judgment order and the Trustee's motion to approve the proposed compromise. Doc. 221 (13 B 10864); Doc. 178 (16 A 552). As to the motion to clarify, the court reasoned that

its summary judgment order was "very clear." Doc. 16 at 6:6-8. As to the motion to approve the compromise—which, if granted, would have restored the 100% contingent survivor annuity option and thereby required the court modify the summary judgment order—the court likewise denied relief. The court stated that it lacked the power to modify its order to implement the proposed compromise, and that even if it had that power, it would decline to do so as a matter of discretion: "I don't think that this is a situation where I have the discretion or I should take the discretion to the extent that I do [have the discretion] to undo my order." *Id*. at 4:8-11.

Regarding its decision to decline to exercise whatever discretionary power it had to modify the summary judgment ruling, the court explained that it believed the ruling was legally correct and therefore should stand: "I had to look at what the trustee was asking me to do and where I believe the case had to come out with respect to the bankruptcy case, and that's what I did." *Id*. at 5:14-17. Next, the court noted that it would be a waste of judicial resources to vacate its summary judgment order at that late stage. The motion had taken over a year to resolve because of settlement talks that ultimately failed, *id*. at 5:19-23, and the court by then had then expended effort to decide the merits of the motion: "A matter [the cross-motions for summary judgment] was brought to my attention, and unless you want to withdraw it, I've got to decide it. I decided it." *Id*. at 6:2-5. The court summed up:

> [T]o the extent that the estate or Ms. Zellmer believe that it is an inappropriate result, the answer is not for me to say, okay, I'll give you a do-over. The answer is to take my rulings to the next level and see whether or not they believe I've made any mistakes of law.

*Id*. at 6:9-14.

The Trustee and Zellmer cross-appealed the summary judgment ruling, with the Trustee seeking full control of the Auxiliary Plan for the bankruptcy estate and Zellmer seeking to remove it from the estate. After filing their appeals, the Trustee and Zellmer continued their

settlement negotiations, and this court granted two motions to stay briefing to accommodate those negotiations. Docs. 28, 31, 33, 35. On July 23, 2020, the Trustee moved the bankruptcy court to approve a new proposed compromise in which the Trustee and Zellmer would effectively wager on the outcome of these appeals. Doc. 43-2 at 43-59. For her part, the Trustee agreed to dismiss her cross-appeal of the bankruptcy court's summary judgment ruling, thereby eliminating any possibility that Zellmer would lose the Auxiliary Plan benefits entirely. *Id*. at 51, ¶ 18. In exchange, Zellmer agreed to pay the Trustee $50,000 should Zellmer win reversal of the summary judgment ruling and thereby regain the 100% contingent survivor annuity, while if this court merely reversed the bankruptcy court's rejection of the original proposed settlement, then Zellmer would make a $75,000 payment in accordance with the terms of the original settlement. *Ibid*.

Bankruptcy Rule 8008 allows a bankruptcy court to issue an "indicative ruling" on an issue when it lacks jurisdiction because of a pending appeal. *See* Fed. R. Bankr. P. 8008(a)(3). The bankruptcy court did so here, indicating that it would approve the new proposed compromise if it had jurisdiction. Doc. 43-2 at 81-82. The Rule provides that the district court may then remand for the limited purpose of allowing the bankruptcy court to issue its ruling. *See* Fed. R. Bankr. P. 8008(c). On the Trustee and Zellmer's motion, this court granted a limited remand, Docs. 37, 39, and the bankruptcy court approved the new proposed compromise, Doc. 43-2 at 119-120. This court then set a new briefing schedule, Doc. 42, and the Trustee dismissed her cross-appeal, Docs. 48, 51.

## Discussion

### I.    Denial of Motion to Approve Compromise

Both the Trustee and Zellmer appeal the bankruptcy court's denial of the Trustee's motion to approve their proposed compromise. Doc. 1 (20 C 494); Doc. 1 (20 C 801). Only

Zellmer filed a brief, and the Trustee formally joined Zellmer's briefing on this issue.  Docs. 50, 52 (20 C 443).  A bankruptcy court's approval or rejection of a compromise is reviewed for abuse of discretion, with any legal questions reviewed de novo.  *See In re Holly Marine Towing, Inc.*, 669 F.3d 796, 799 (7th Cir. 2012).

Zellmer contends at the outset that "the settlement did not require the Bankruptcy Court to vacate the summary judgment order."  Doc. 50 at 18.  That argument is meritless.  The bankruptcy court's summary judgment ruling unambiguously nullified the 100% contingent survivor annuity election and required the Auxiliary Plan to revert to the default 50% election. 601 B.R. at 654 ("[T]he Court holds that the unauthorized Payment Election of the 100% contingent survivor annuity under the Auxiliary Plan is an avoidable post-petition transfer under the statutory provision and will be avoided."); *id.* at 655 ("With the Payment Election nullified, the estate is entitled to the default payment option of the 50% contingent survivor annuity."). The proposed compromise sought to undo those holdings so that the bankruptcy estate could sell Zellmer larger contingent annuity installments for a one-time payment of $75,000, to the benefit of the estate and Zellmer but to the detriment of MetLife.  Doc. 11-14 at 115-116, ¶¶ 4-5. Partially vacating the summary judgment order was a necessary and central component of the proposed compromise.

Zellmer next argues that, even if the proposed compromise necessarily entailed partial vacatur of the summary judgment ruling, the bankruptcy court was obligated to vacate that ruling.  As Zellmer sees it, because the Trustee had the power to initiate an adversary proceeding under 11 U.S.C. § 549(a) to avoid O'Malley's distribution election, the Trustee retained the unilateral authority to waive avoidance even after the court had ruled in her favor: "[T]he Trustee had not only the power to avoid the payment election, but also the right to relinquish her power

to avoid the payment election." Doc. 50 at 19. In support, Zellmer cites cases holding that a trustee has discretion whether to seek avoidance, which is true enough. *Ibid*.; *see* 11 U.S.C. § 549(a) ("[T]he trustee *may* avoid a transfer of property of the estate … .") (emphasis added). But Zellmer's conclusion does not follow from that premise. *Every* litigant has a discretionary choice before bringing a lawsuit or filing a motion. That choice does not imply that a party may, after obtaining a favorable ruling, freely rescind that ruling as it sees fit, with the court's role limited to rubber-stamping the rescission. *See Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015) (holding that "the district court had the *discretion* to reconsider its prior summary judgment ruling") (emphasis added). So, the Trustee needed the bankruptcy court's approval to effectuate a compromise that would entail partially vacating the summary judgment order.

The bankruptcy court gave two reasons for refusing to do so. First, the court stated that it did not "have the discretion" to vacate its summary judgment ruling. Doc. 16 at 4:9. That was incorrect. As noted, the court's May 23, 2019 order ruled on the cross-motions for summary judgment but did not set forth who owed how much to whom. Doc. 11-12 at 48; Doc. 11-13 at 1. An order fixing the dollar amount of MetLife's liability to the Trustee did not follow until January 23, 2020, Doc. 15-12 at 15-16, *after* the court on January 8, 2020 had rejected the proposed compromise. Thus, when the court rejected the compromise, there was no final judgment, but merely a partial grant of summary judgment on liability. *See Johnson v. Acevedo*, 572 F.3d 398, 400 (7th Cir. 2009) ("Every judgment must be self-contained and specify the relief being awarded."). That partial grant of summary judgment remained interlocutory and subject to revision. *See Janky v. Lake Cnty. Convention & Visitors Bureau*, 576 F.3d 356, 359 (7th Cir. 2009) ("'[P]artial summary judgment[s] limited to the issue of [a] petitioner's liability … are by their terms interlocutory, *see* Fed. Rule Civ. Proc. 56(c), and where assessment of damages …

remains to be resolved have never been considered to be 'final' … .'") (quoting *Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 744 (1976)). The bankruptcy court therefore had discretion on January 8, 2020 to modify its summary judgment ruling. If the court had limited its analysis to the proposition that it lacked discretion to modify its ruling, then its denial of the motion for compromise would have amounted to an abuse of discretion. *See Dolin v. GlaxoSmithKline LLC*, 951 F.3d 882, 889 (7th Cir. 2020) ("[W]here the law gives a court discretion that the court does not recognize and exercise, [t]he failure of the trial court to exercise its discretion at all … constitutes an abuse of discretion.") (quotation marks omitted).

But the bankruptcy court also held, in the alternative, that it would decline to disturb its summary judgment ruling even if it had the discretion to do so: "I don't think that this is a situation where … I should take the discretion to the extent that I do [have discretion] to undo my [summary judgment] order." Doc. 16 at 4:8-11. In so holding, the court reiterated its view that it had correctly resolved the legal issues in the adversary proceeding: "I had to look at the law. … I had to look at what the trustee was asking me to do and where I believe the case had to come out … ." *Id*. at 5:13-16. The court also invoked the practical concerns of case administration. As the court noted, the parties had asked the court to stay consideration of the summary judgment motions in November 2018 for settlement talks, but those talks had failed. *Id*. at 5:19-23; Doc. 15-11 at 57-63; Doc. 15-12 at 1-3. Then, when O'Malley unexpectedly died in May 2019, the bankruptcy court was already "done with [its] opinion." Doc. 16 at 5:24. At that point, O'Malley's counsel asked for another stay pending further negotiations, Doc. 11-11 at 121-122, but the court denied that request, explaining that "I can't stop and start my work based on whether people may or may not settle," Doc. 16 at 6:1-2. Having prepared and issued a

13

comprehensive decision on the summary judgment motions, the court held that it was "simply too late for this court to redo at this point in time." *Id*. at 6:21-22.

Zellmer's appellate briefing does not assail the discretionary bases articulated by the bankruptcy court for its refusal to modify its summary judgment ruling. Instead, as noted, Zellmer incorrectly argues that, despite the ruling, the Trustee retained the unilateral power to waive her avoidance power even after the bankruptcy court ruled. Doc. 50 at 18. Zellmer also contends that the summary judgment order remained subject to revision because she had moved to clarify it. Doc. 54 at 13. Zellmer's arguments thus focus on the bankruptcy court's *authority* or *obligation* to modify its summary judgment ruling, rather than its discretionary *choice* not to. As explained, the bankruptcy court was not obliged to vacate that ruling, though it did have the authority to do so. In failing to challenge the reasons given by the bankruptcy court for why, in the exercise of its discretion, it would not vacate the summary judgment ruling, Zellmer forfeited any arguments she might have presented for reversing that discretionary decision. *See Hackett v. City of S. Bend*, 956 F.3d 504, 510 (7th Cir. 2020) ("An appellant who does not address the rulings and reasoning of the district court forfeits any arguments he might have that those rulings were wrong."); *Klein v. O'Brien*, 884 F.3d 754, 757 (7th Cir. 2018) ("[A]n appellate brief that does not even *try* to engage the reasons the appellant lost has no prospect of success.").

Even setting aside forfeiture, the reasons the bankruptcy court gave for exercising its discretion to not modify its summary judgment order were sound. Bankruptcy Rule 9019(a) provides that, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement," thus conferring discretion upon the bankruptcy court. "In conducting a hearing under Rule 9019(a), the bankruptcy court is to determine whether the proposed compromise is fair and equitable and in the best interests of the bankruptcy estate."

*Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994) (citations omitted).

The bankruptcy court also must consider the rights of non-settling parties, such as MetLife, in

the Rule 9019(a) analysis. *See In re Fundamental Long Term Care, Inc.*, 569 B.R. 904, 917

(Bankr. M.D. Fla. 2016) ("[W]hen the rights of a non-settling third party are implicated by a

proposed compromise, it is appropriate to consider the third-party's rights in deciding whether to

approve the compromise."), *aff'd*, 873 F.3d 1325 (11th Cir. 2017); *In re Fleming Packaging

Corp.*, 2007 WL 4556981, at *3 (Bankr. C.D. Ill. Dec. 20, 2007) ("[I]n reviewing a settlement

between a plaintiff and fewer than all co-defendants, the court must carefully consider its

fairness to the non-settling parties … ."); *In re Med. Asset Mgmt., Inc.*, 249 B.R. 659, 663

(Bankr. W.D. Pa. 2000) ("The fairness to the settling parties of a proposed settlement agreement

may not warrant its approval if the rights of others who are not parties to the settlement

agreement are unduly prejudiced.").

Here, the bankruptcy court explained that it believed its summary judgment ruling to be

correct and that it would be inappropriate under the circumstances to vacate that ruling merely to

facilitate the proposed settlement.  It is not an abuse of discretion for the bankruptcy court to

refuse to vacate a presumptively correct order—even an interlocutory one—solely to

accommodate the parties' private interests.  *See U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*,

513 U.S. 18, 26 (1994) ("Judicial precedents are presumptively correct and valuable to the legal

community as a whole.  They are not merely the property of private litigants and should stand

unless a court concludes that the public interest would be served by a vacatur."); *In re Mem'l

Hosp. of Iowa Cnty., Inc.*, 862 F.2d 1299, 1302 (7th Cir. 1988) ("When a clash between genuine

adversaries produces a precedent … the judicial system ought not allow the social value of that

precedent, created at cost to the public and other litigants, to be a bargaining chip in the process

of settlement. The precedent, a public act of a public official, is not the parties' property.").
That was particularly true here, given that MetLife was effectively asked to fund the compromise
between the Trustee and Zellmer, resulting in a situation where all interested parties were not in
unanimous agreement that the bankruptcy court's ruling should be vacated.

The bankruptcy court next explained that it would be inefficient and impractical to vacate
a 43-page summary judgment ruling produced after a year's consideration. Stewardship of
scarce judicial resources was another legitimate basis for declining to vacate that ruling and, as a
result, rejecting the proposed compromise. *See In re Mem'l Hosp. of Iowa Cnty., Inc.*, 862 F.2d
at 1302 ("[I]t may be inappropriate to approve a settlement that squanders judicial time that has
already been invested. The bankruptcy and district judges devoted many hours to this case and
resolved it on the merits."); *cf. Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012)
(affirming the district court's denial of the plaintiff's motion for leave to file instanter a summary
judgment opposition where, by the time the plaintiff filed the motion, the district court "had
already gone through the effort of analyzing the case and drafting its summary judgment
Opinion"). In moving for summary judgment, the Trustee ran the risk that the court might
decide that motion at any time, thereby altering the legal relationships among the parties. There
accordingly was no abuse of discretion in bankruptcy court's rejection of a proposed
compromise that would have upended its summary judgment ruling.

## II.    Summary Judgment Ruling

Zellmer also appeals the bankruptcy court's summary judgment ruling on the merits.
Doc. 2. "A summary judgment in a bankruptcy adversary proceeding is treated as any other
summary judgment, so [the standard of] review is de novo." *In re hhgregg, Inc.*, 949 F.3d 1039,
1044 (7th Cir. 2020). Civil Rule 56(a) "provides that summary judgment is appropriate if there
is no genuine issue of material fact and the moving party is entitled to judgment as a matter of

law." *Doe v. Archdiocese of Milwaukee*, 772 F.3d 437, 440 (7th Cir. 2014). "That same standard applies in bankruptcy proceedings as well." *Ibid.*; *see* Fed. R. Bankr. P. 7056 ("[Civil Rule 56] applies in adversary proceedings … .").

### A.     Ownership of the Auxiliary Plan

Zellmer first challenges the bankruptcy court's ruling that the Auxiliary Plan passed into the bankruptcy estate due to O'Malley's failure to properly schedule it as exempt in his Schedule C.  601 B.R. at 639-50.  The default rule in bankruptcy is that "all legal or equitable interests of the debtor in property as of the commencement of the case" pass into the estate, subject to certain exceptions not relevant here.  11 U.S.C. § 541(a)(1); *see Payne v. Wood*, 775 F.2d 202, 204 (7th Cir. 1985) ("Under the Bankruptcy Act all property of the debtor becomes part of the estate available to satisfy the creditors' claims.").  "The debtor then may remove some of the property by claiming exemptions under 11 U.S.C. § 522(b)." *Payne*, 775 F.2d at 204.  As noted, the debtor claims property as exempt by filing a Schedule C, which discloses the value and legal basis of each claimed exemption.  *See* 11 U.S.C. § 522(*l*) ("The debtor shall file a list of property that the debtor claims as exempt under subsection (b) of this section."); Fed. R. Bankr. P. 4003(a) (requiring Schedule C to be filed alongside Schedule B, the debtor's schedule of assets).

A debtor's failure to claim an item of property as exempt in Schedule C means that the item passes automatically into the estate.  "If the debtor does not claim an exemption with respect to particular property, the rule of inclusion stated in § 541 controls, and the property goes to the creditors." *Payne*, 775 F.2d at 204.  A symmetrical waiver rule burdens the creditors, with § 522(*l*) providing that "[u]nless a party in interest objects, the property claimed as exempt on such list is exempt."  Bankruptcy Rule 4003(b)(1), in turn, sets a deadline—the details of which are irrelevant here—for making such objections.  The failure of a party in interest to object to a

17

properly claimed exemption means that the property is exempt, "whether or not [the debtor] had a colorable statutory basis for claiming [the exemption]." *Taylor v. Freeland & Kronz*, 503 U.S. 638, 644 (1992).

Because of these waiver rules, whether the Auxiliary Plan passed into the bankruptcy estate depends entirely on whether O'Malley properly claimed it as exempt. O'Malley listed a single "Met Life Defined Benefit Pension Plan" on his Schedule C. Doc. 11-14 at 64. The Trustee did not object to that claimed exemption. Doc. 15-3 at 91-92. Therefore, if the claimed exemption included the Auxiliary Plan, any objection was long since waived under § 522(*l*) and Bankruptcy Rule 4003(b)(1). But, if the claimed exemption did not include the Auxiliary Plan, then the Plan passed into the bankruptcy estate under § 541(a)—regardless of the exemption's substantive merits.

The question whether O'Malley's claimed exemption included the Auxiliary Plan turns on whether his disclosure of a single "Defined Benefit Pension Plan" put the Trustee on notice that he was claiming as exempt a non-tax-qualified deferred compensation plan. *See Payne*, 775 F.2d at 206 (holding that a claimed exemption must "contain[] sufficient detail to put the trustee on notice of questionable assertions"); *In re Bauman*, 2014 WL 816407, at *12 (Bankr. N.D. Ill. Mar. 4, 2014) ("If a debtor fails to provide enough detail, he is deemed not to have claimed the exemption."). The standard is objective, based solely on what the debtor disclosed on his Schedule C, not on his subjective intentions. *See Schwab v. Reilly*, 560 U.S. 770, 788 (2010) (holding that the analysis "does not rest on what the debtor 'meant' to exempt," but on "the face of a debtor's claimed exemption").

The bankruptcy court correctly held that "[l]isting one single plan simply did not put the Trustee on notice of an exemption claim of two plans"—the Traditional Plan and the Auxiliary

18

Plan. 601 B.R. at 642. True, ERISA's definitions of the terms O'Malley used—"pension plan" and "defined benefit plan"—are broad and would cover both the Traditional Plan and the Auxiliary Plan. *See* 29 U.S.C. § 1002(2) (defining "pension plan" as "any plan, fund, or program" that "provides retirement income" or "results in a deferral of income"); *id*. § 1002(35) (defining "defined benefit plan" as "a pension plan other than an individual account plan"). But employee benefits law draws a clear line between plans (like the Traditional Plan) designed to comply with ERISA and achieve tax-qualified status, on the one hand, and non-ERISA plans (like the Auxiliary Plan) that defer compensation in excess of IRC limits, on the other. ERISA excludes from many of its protections so-called "top hat" plans, defined as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). Relatedly, the IRC caps both the amount of compensation that may be considered for tax-qualified contributions, *see* 26 U.S.C. § 401(a)(17), and the level of tax-qualified distributions that participants may receive, *see id*. §§ 401(a)(16), 415(b). *See generally Olander v. Bucyrus-Erie Co.*, 187 F.3d 599, 604-06 (7th Cir. 1999) (summarizing these ERISA and IRC provisions).

The Traditional Plan was designed to avoid these exclusions, stay within ERISA's protections, and retain tax-preferred treatment. The Auxiliary Plan did precisely the opposite. In the bankruptcy court, the Trustee asserted and MetLife conceded that the Auxiliary Plan was a "top hat" plan under ERISA. Doc. 11-10 at 90, ¶ 17. The plan document stated explicitly that its purpose was "to provide to certain participants … the excess amount [of deferred compensation] that would have been payable under the [Traditional] Plan in the absence of [IRC] limitations." Doc. 11-5 at 70, art. 1. While the Traditional Plan was open to nearly all MetLife employees, *id*.

at 13, § 1.20, the Auxiliary Plan limited participation to employees whose salaries exceeded the caps on tax-qualified contributions and distributions, *id.* at 70-71, art. 2.1.

Also significant are the requirements of § 409A of the IRC. "Nonqualified deferred compensation plans" like the Auxiliary Plan are subject to § 409A, but tax-qualified plans like the Traditional Plan are not. *See* 26 U.S.C. § 409A(a)(1) (imposing penalties on a "nonqualified deferred compensation plan" that fails to comply with § 409A); *id.* § 409A(d) (defining "nonqualified deferred compensation plan" by way of exclusion to mean plans not "described in" § 219(g)(5)); *id.* § 219(g)(5)(A)(i) (listing qualified pension plans described in § 401(a)). Among other things, § 409A limits the timing and form of distributions and—especially relevant here—constrains the participant's ability to alter the form of distributions once they begin. *See id.* § 409A(a)(2)-(4). Section 409A imposes harsh tax consequences when a plan runs afoul of its provisions: All previously deferred compensation becomes immediately taxable, plus interest, plus a 20 percent penalty. *See id.* § 409A(a)(1). Whether a plan is subject to § 409A is therefore of immense importance to tax professionals and plan participants.

Finally, given that O'Malley's Schedule C cited Illinois law to support exempting his pension plan from the bankruptcy estate, it bears note that the primary Illinois statute exempting retirement plans from bankruptcy, 735 ILCS 5/12-1006, has been interpreted to cover only tax-qualified plans. The Seventh Circuit has so stated in dicta. *See In re Schoonover*, 331 F.3d 575, 577 (7th Cir. 2003) (stating that "a tax-qualified 'retirement plan'" would merit "an exemption under § 12-1006"); *In re Weinhoeft*, 275 F.3d 604, 606 (7th Cir. 2001) (observing that, "for employees in the private sector," the protections of § 12-1006 cover "only tax-qualified plans"). Bankruptcy courts have affirmatively held that only tax-qualified plans are exempt. *See In re West*, 507 B.R. 252, 259 (Bankr. N.D. Ill. 2014); *In re Jokiel*, 453 B.R. 743, 747 (Bankr. N.D. Ill.

2011). Zellmer argues that the Seventh Circuit's statements and the bankruptcy courts' holdings are incorrect, Doc. 50 at 29-34, and, to be clear, this court does not pass on the scope of 735 ILCS 5/12-1006. But whatever the ultimate merits of the issue, the fact that courts routinely distinguish tax-qualified plans from § 409A plans should have prompted O'Malley to list his two plans—the Traditional Plan and the Auxiliary Plan—separately on his Schedule C. The Traditional Plan was plainly exempt, but the Auxiliary Plan's status was murky at best.

Given this legal backdrop, O'Malley failed in his Schedule C to give sufficient notice of the Auxiliary Plan. ERISA, the IRC, and Illinois law differentiate tax-qualified plans open to everyone from plans for highly compensated employees that receive less favorable tax treatment. The Traditional Plan was the former, and the Auxiliary Plan was the latter. In listing on his Schedule C a single MetLife pension plan, without caveat or further detail, O'Malley failed to give sufficient notice that he held interests in both types of plan. If anything, his vague disclosure concealed his interest in the Auxiliary Plan. It necessarily follows under 11 U.S.C. § 541(a) that the Auxiliary Plan passed into the bankruptcy estate. *See Payne*, 775 F.2d at 206.

### B. Avoidance of the 100% Contingent Survivor Annuity Election

Zellmer next argues that, even if the Auxiliary Plan passed into the bankruptcy estate, the bankruptcy court erred in avoiding O'Malley's election of the 100% contingent survivor annuity. Doc. 50 at 25-29. A trustee has the power under 11 U.S.C. § 549(a) to "avoid" the unauthorized post-petition transfer of property out of the estate. *See Grede v. FCStone, LLC*, 746 F.3d 244, 254 (7th Cir. 2014) ("A bankruptcy trustee can avoid a transfer of property of the estate that occurs after the commencement of the case if it was not authorized under the bankruptcy code or by the bankruptcy court."). There is no dispute that O'Malley, by electing the 100% option, shifted some of the Auxiliary Plan's value to Zellmer, thereby unlawfully transferring estate

property to her.  601 B.R. at 653-54.  Nevertheless, Zellmer contends that avoiding the 100%

contingent survivor election violated § 409A(a)(4)(C) of the IRC, which imposes a tax penalty

for changing the form of deferred compensation distributions after payments begin.  Doc. 50 at

26.  The bankruptcy court held, and MetLife now maintains, that avoiding the election did not

violate § 409A because the statute does not prohibit nullifying an election and selecting a

different but actuarially equivalent one.  601 B.R. at 652; Doc. 53 at 27-30.

The premise shared by both sides of the debate is that 26 U.S.C. § 409A *prohibits* some

changes in participant elections, setting up a potential conflict between § 409A and the

bankruptcy avoidance power under 11 U.S.C. § 549(a).  That premise is flawed.  Many laws

directly prohibit certain conduct.  For example, if O'Malley had kept a protected migratory bird

as a pet and set it free during his bankruptcy, the Migratory Bird Treaty Act would have made it

"unlawful" for the Trustee to attempt to recapture the bird "at any time, by any means or in any

manner."  16 U.S.C. § 703.  Section 409A of the IRC is not that sort of law, as it imposes merely

a price for, not an outright prohibition on, its violation: If "a nonqualified deferred compensation

plan … is not operated in accordance with" § 409A, then all previously deferred compensation

becomes immediately taxable, plus interest and a penalty.  26 U.S.C. § 409A(a)(1).  Granted,

given the severity of the penalty for noncompliance, most tax planners surely treat § 409A as a

prohibition, not a price.  But in some circumstance a plan administrator—or a bankruptcy

trustee—might find it beneficial to pay the penalty rather than comply with § 409A, much like a

party's decision to undertake an efficient breach of a contract.  *See XCO Int'l Inc. v. Pac. Sci.*

*Co.*, 369 F.3d 998, 1001 (7th Cir. 2004) ("[I]f there is a very stiff penalty for breach, parties will

be discouraged from committing 'efficient' breaches, that is, breaches that confer a greater

benefit on the contract breaker than on the victim of the breach … .").

As a result, contrary to Zellmer's submission, there is no inexorable conflict between 26 U.S.C. § 409A and a trustee's avoidance power under 11 U.S.C. § 549(a). This conclusion comes with an important caveat, however. Although § 409A does not directly constrain the avoidance power, the terms of the Auxiliary Plan itself imposed some comparable limits. "Filing a bankruptcy petition does not expand or change a debtor's interest in an asset; it merely changes the party who holds that interest." *In re Sanders*, 969 F.2d 591, 593 (7th Cir. 1992). "To the extent an interest is limited in the hands of a debtor, it is equally limited as property of the estate." *Ibid*. (citations omitted). The Auxiliary Plan restricted elections of non-default annuities, referencing § 409A: "Participants … will be able to elect, in accordance with [IRC §] 409A, *as determined by the Plan Administrator*, among actuarially equivalent annuity forms of benefit any time *prior to the payment commencement date* for such benefit." Doc. 11-5 at 74, art. 4.4(a) (emphases added). Thus, because O'Malley lacked unilateral authority to make a new election without MetLife's consent, the Trustee lacked that authority as well. And the Trustee could not make a new election after the commencement of the payment of benefits because the Auxiliary Plan—not § 409A as such—prohibited her from doing so.

All that said, the bankruptcy court correctly held that this Auxiliary Plan provision did not prevent rescinding O'Malley's election of the 100% contingent survivor annuity. 601 B.R. at 652. Avoiding the 100% option did not make a new election so much as undo an unauthorized one. This conclusion lies in the distinction between a trustee's claiming an expanded property interest—which is prohibited—and a trustee's revoking previous transactions—which is routine. The point is well illustrated by *In re Feiler*, 218 F.3d 948 (9th Cir. 2000), which concerned the trustee's closely related power to avoid fraudulent *pre*-petition transfers under 11 U.S.C. § 548(a). The debtors in *Feiler* chose to carry forward certain tax losses, which removed about

23

$300,000 from the estate. 218 F.3d at 950-51. The government conceded that the transfer had been fraudulent but argued that it was irrevocable under the IRC. *Id*. at 952. The Ninth Circuit disagreed, explaining that "what property is part of the bankruptcy estate and what property may be recovered with a trustee's avoidance powers are two separate questions." *Id*. at 953. The Ninth Circuit added that "it is well recognized that … § 548 gives a trustee power to avoid transactions by which a debtor would otherwise be bound," *id*. at 952, and that, "[o]nce avoided, the transaction is a nullity and is treated as if it never happened," *id*. at 953. This rule stands to reason, for without it debtors could easily contract around the trustee's avoidance powers by irrevocably alienating estate property. *See In re Bell*, 194 B.R. 192, 197 (Bankr. S.D. Ill. 1996) (holding that "nullification means that the transfer is retroactively ineffective and that the transferee … legally acquired nothing through it").

Applying those principles here, the outcome is just as the bankruptcy court held. For the Trustee to revoke (with the bankruptcy court's approval) O'Malley's post-petition 100% contingent survivor annuity election under § 549(a) was lawful, even though O'Malley could not himself have undone the transaction. At the same time, the Trustee could not make a new election because that would require altering the Plan's terms, in effect granting the Trustee a property interest that O'Malley never possessed. The net result was that the default election under the Auxiliary Plan automatically sprang into place: "a 50% contingent survivor annuity, with the spouse of the Participant [Zellmer] as the survivor annuitant." Doc. 11-5 at 73, art. 4.3(b)(ii).

Finally, Zellmer appeals the bankruptcy court's denial of her motion for "clarification" of the summary judgment ruling. Doc. 2; Doc. 11-13 at 2-8. As noted, the motion was styled under Civil Rule 59(e), made applicable through Bankruptcy Rule 9023. As an initial matter, because

the partial grant of summary judgment as to liability was interlocutory, Civil Rule 59 did not

apply. *See Terry v. Spencer*, 888 F.3d 890, 893 (7th Cir. 2018) ("Rule 59 is not the right

procedural hook for seeking reconsideration of a nonfinal order."). That said, courts "may

reconsider interlocutory orders at any time before final judgment," *ibid.*, so this technical point is

not dispositive.

As for the motion's substance, Zellmer's submission that she was seeking merely a

clarification was optimistic to the point of being unrealistic. While recognizing that O'Malley's

election of the 100% contingent survivor annuity had been avoided, she sought to preserve that

election as to her. Doc. 11-13 at 6-7, ¶¶ 8-10. That request sought vacatur, not clarification, of

the bankruptcy court's ruling. The only change in circumstance that Zellmer cited was her

husband's death, *id.* at 6, ¶ 7, but she did not explain how that tragic development affected any

pertinent legal issue in the proceeding. The motion for clarification presented nothing to

undermine the bankruptcy court's reasoning and was properly denied.

### Conclusion

The bankruptcy court's orders avoiding O'Malley's 100% contingent survivor annuity

election and replacing it with the 50% option, denying Zellmer's motion for clarification, and

denying the Trustee's motion for a compromise settlement are affirmed.

March 2, 2021

_____
United States District Judge